## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VERTEX, INC. | | |
| | Plaintiff, | Civil Action No.: _____ |
| v. | | |
| | | **COMPLAINT** |
| AVALARA, INC. and | | |
| DOES 1 – 10, inclusive, | | |
| | | **JURY TRIAL DEMANDED** |
| | Defendants. | |

Plaintiff Vertex, Inc. ("Vertex") by its attorneys, on personal information as to its own acts, and on information and belief as to all others based on its investigation, for its complaint against Defendants Avalara, Inc. ("Avalara") and DOES 1 – 10, alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff Vertex brings this civil action against Defendants Avalara and DOES 1 – 10 for unfair competition and intentional interference with contractual relations pursuant to Pennsylvania common law, and trade secret misappropriation pursuant to the Defend Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act.

2.      Vertex is a leading global provider of enterprise tax technology solutions. Avalara is also a tax solution provider for small-to-mid-sized companies, and while it does not yet have significant operations in the enterprise space, it has publicly expressed its plans to develop enterprise products that would directly compete with Vertex—including in Avalara's quarterly investor calls and public financial filings. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ LCR-Dixon Corp. ("LCR-Dixon"), with which Vertex had partnered for several years to provide its enterprise customers with an optimized integration between SAP and its own tax solutions.  While

Avalara needs the kinds of technology and products that LCR-Dixon offers to expand into the enterprise space— ███████████████████████████████████████████████

████████████████████████████████████████████

3.   ████████████████████████████████████████████████

Two weeks after ████████████ LCR-Dixon had agreed to sell its business to Vertex, Avalara kicked off an anti-competitive and unlawful campaign to poach nearly all of LCR-Dixon's 18-person workforce.  Then, in the weeks following the public announcement of Vertex's agreement to purchase LCR-Dixon in September 2021, Avalara, including its Executive Vice President of Corporate Development, contacted and attempted to lure to Avalara more than 70% of the LCR-Dixon workforce.  With no interviews, each employee who responded to Avalara's outreach received an identical offer for an unspecified position with an unspecified role—and a rich compensation package.  Avalara's ongoing raid of LCR-Dixon's employees is unquestionably designed to cripple Vertex's newly acquired business and gain access to the valuable LCR-Dixon technology and trade secret information that it desperately needs to develop enterprise products. As Avalara even told some of LCR-Dixon's then-employees during calls to lure them to Avalara, Avalara intends to "destroy" Vertex.

4.   Based on ongoing forensic investigation, at least two of the six employees that Avalara has successfully convinced to leave LCR-Dixon took massive amounts of LCR-Dixon's (and now Vertex's) trade secrets with them—including, for example:

- **more than __70__** comprehensive files of LCR-Dixon's highly confidential and proprietary source code;

- **more than __250__** files containing portions of highly confidential and proprietary custom source code developed for specific clients;

- **more than <u>600</u>** technical and functional specs, design and configuration documents, and implementation templates for LCR-Dixon's software;

- **more than <u>150</u>** documents detailing the specifics of Vertex's software, including user guides, installation and configuration guides, and interface guides, any one of which will afford Avalara an insider's view of how its competitor Vertex operates; and

- confidential LCR-Dixon client lists.

5.      And this is just the tip of the iceberg: it is possible that other now-departed employees misappropriated LCR-Dixon's (now Vertex's) trade secrets, but Vertex has been stymied in its investigation because some of the employees that left for Avalara seem to have covered their tracks by unilaterally resetting their LCR-Dixon laptops to factory settings before returning them.  This unusual action wiped out most of the data from those devices.

6.      Avalara's workforce raid has also allowed Avalara to gain employees who have knowledge of LCR-Dixon's proprietary software and technology, implementations, and customer relationships (including with Vertex)—knowledge that they cannot unlearn and are inevitably using in their new roles to develop a competitive product at Avalara.

## PARTIES

7.      Plaintiff Vertex, Inc. is a Delaware corporation with its principal place of business at 2301 Renaissance Boulevard, King of Prussia, Pennsylvania 19406.  By virtue of its acquisition of LCR-Dixon, Vertex has assumed all of LCR-Dixon's intellectual property interests, including ownership of its confidential, proprietary, and trade secret information.

8.      Defendant Avalara, Inc. is a Washington corporation with its principal place of business at 255 South King Street, Suite 1800, Seattle, Washington 98104.

9.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 – 10, inclusive, and each of their roles in this case, are unknown to Vertex, who therefore sues said Defendants by such fictitious names.  Vertex further alleges that each fictitiously named Defendant is in some manner responsible for the acts and occurrences set forth herein.  Vertex will amend this Complaint to show their true names and capacities when that information is ascertained, as well as the manner in which each fictitiously named Defendant is responsible for the acts and occurrences set forth herein.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

11.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Vertex asserts a claim that arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Avalara has caused and is continuing to cause harm to Vertex, a corporation headquartered in this district that develops and sells its products in this district.

## GENERAL ALLEGATIONS

### Vertex Acquired LCR-Dixon To Ensure It Had Continued Access To LCR-Dixon's Proprietary SAP Tax Programs

13.     Vertex is a market-leading global provider of indirect tax technology solutions.  An indirect tax is one that is collected by an entity in the supply chain of a good or service (such as a retailer) and paid to the government, and is passed on to the consumer as part of the purchase price.  Vertex provides cloud-based and on-premise solutions that can be tailored to specific industries for major lines of indirect tax, including sales and consumer use, value added,

and payroll.  It provides industry-leading enterprise tax technology solutions to more than 4,000 companies in 130 countries.  These tax solutions connect to key business software applications, such as Systems Applications and Products ("SAP") and Enterprise Resource Planning ("ERP") software, to improve the accuracy of indirect tax determinations across a client's entire supply chain.  Vertex has developed and refined its tax solutions over the course of more than 40 years —and, today, more than half of the Fortune 500 depend on Vertex to provide tax solutions for their multinational businesses.

14.     LCR-Dixon, founded in 2006, was a company of 18 employees with a specialized expertise in SAP technologies.  LCR-Dixon was a leading provider of tax intelligence solutions, SAP data management tools, and pre-developed solutions to optimize the integration between SAP and tax systems.  It developed a suite of tools and programs to enhance a customer's ability to maintain, analyze, and validate certain tax data.  These tools and programs optimize the ability of tax products like Vertex's to integrate with a client's SAP software.  LCR-Dixon's tools and programs act as gap-fillers between standard SAP software and tax software, enhancing the integration between the two applications and enabling advanced indirect tax calculations and management of complex global compliance requirements.

15.     LCR-Dixon historically licensed its industry-leading products to paying customers like Vertex, which has operated as a re-seller of LCR-Dixon's products since 2014. Indeed, for seven years, LCR-Dixon's tools have been a key component of Vertex's offerings to its SAP customers.  Vertex and LCR-Dixon's partnership was well-known in the industry, including to Defendant Avalara.[1]  Several of LCR-Dixon's tools were specifically developed to

---

[1]   *See, e.g.*, "Vertex Announces Strategic Relationship with LCR-Dixon," https://www.businesswire.com/news/home/20141028005044/en/Vertex-Announces-Strategic-Relationship-with-LCR-Dixon; "LCR-Dixon: Building New Frontiers in SAP Tax Management,"

improve functionality and performance for SAP indirect tax processes and are seamlessly integrated with Vertex's tax determination software.

16.     More specifically, Vertex sells its SAP customers its O-Series tax program, which is a tax determination solution that automates and centralizes indirect tax determination, supporting everything from determining tax jurisdictions and maintaining an accurate rate database to calculating complex transactions.  O-Series is integrated with an SAP-based suite of programs known as the Accelerator, which was developed in partnership with LCR-Dixon.

17.     The Accelerator enables companies to manage tax processes within SAP and helps to make the tax software more effective and easier to deploy.  While the Accelerator was developed by Vertex and is available only to Vertex customers, it includes core LCR-Dixon technology, such as SPOT Reports, SPOT VAT Reports, and TUESday.  SPOT Reports and SPOT VAT Reports capture comprehensive transaction and tax data details for accounts-payable and accounts-receivable processes from more than 300 fields in more than 60 SAP tables.  And TUESday provides configuration-ready integration tools to control tax calculations and pass custom data between SAP and the tax system.  SPOT Reports and TUESday were both available to LCR-Dixon's paying customers, like Vertex, who offered products in the enterprise SAP tax marketplace.

18.     LCR-Dixon's proprietary, niche suite of products were developed in-house over the course of 15 years.  These software products included TUESday and SPOT Reports, as well numerous other SAP tax solutions, such as:

- Diagnostax – analyzes and cleanses data to measure and increase tax accuracy;

---

https://sap.cioreview.com/vendor/2015/lcr-dixon; "Introducing Vertex® Indirect Tax Accelerator for SAP," https://www.businesswire.com/news/home/20150318005240/en/Introducing-Vertex%C2%AE-Indirect-Tax-Accelerator-for-SAP.

- flexRFC AP – processes use tax adjustments in SAP to enable companies to remit those tax adjustments on their returns;

- flexRFC AR – processes tax credits to customers without re-issuing the invoice.  flexRFC AR can process multiple credits simultaneously with links back to the original billing;

- FLUX Monitor – tracks and notifies companies of changes in SAP that can impact their tax obligations; and

- VENDORecon– real-time AP balancing program that facilitates touch-free automation when using an external Tax Application.

19.    At all times, LCR-Dixon maintained a lean team of highly-specialized individuals who were focused on developing advanced SAP-tax solutions that no other company delivers.  In that way, LCR-Dixon's technology and its people are unique.  They have a level and type of experience that is difficult to find, and the information they have learned and developed over time at LCR-Dixon simply exists nowhere else.

20.    In June 2021, LCR-Dixon informed Vertex that it had decided to sell its business.  Given the longstanding partnership between the companies and the importance of the integrated LCR-Dixon products to Vertex's business, Vertex entered into negotiations with LCR-Dixon to acquire it.  Vertex understood that operating without LCR-Dixon's tools would have a chilling effect on Vertex's business and require Vertex to start from scratch to build similar tools and programs.  Doing so would not only require finding people with the niche technical knowledge to build such specialized programs, but also a significant monetary investment that would take years to see to fruition, if at all.  This would result in the loss of business in the interim, as Vertex would no longer be able to offer to its existing and prospective customers a key component of its SAP tax offering.  Importantly, prior to the sale to Vertex, LCR-Dixon's products were the most widely licensed SAP tax reporting solutions and data management products in the enterprise market.  In fact, LCR-Dixon products were re-sold by three of the five indirect tax software

vendors—each of whom are certified by SAP—and it has become the industry standard for such applications.

21.     On September 23, 2021, Vertex announced its acquisition of LCR-Dixon for nearly $100 million.  Upon closing, LCR-Dixon became a wholly owned subsidiary of Vertex, and has since merged into Vertex.  By virtue of the sale to Vertex, LCR-Dixon's products are no longer available for others to license; they now belong exclusively to Vertex.

### Avalara Has Raided LCR-Dixon With The Intent to Cripple Vertex's Newly Acquired Business

22.     Defendant Avalara is a cloud-based tax solution provider, which primarily has targeted smaller or mid-market companies with 20 to 500 employees for its products.  While Avalara does not yet have significant operations in the enterprise tax market on behalf of major corporations like Vertex does, it has announced its plans to build a tax solution for the enterprise market that interfaces with SAP software, which would directly compete with Vertex's enterprise SAP tax products.  In Avalara's own words, "[w]hile mid-market and smaller customers, with 20 to 500 employees, have historically been our primary target segment for marketing and selling our solutions, *we are focused on extending our customer reach through investments in product and go-to-market capabilities that address the enterprise and emerging small business market segments globally*."[2]

---

[2] Avalara's December 31, 2020 Form 10-K at 3, available at https://investor.avalara.com/press-releases/events-and-presentations/default.aspx and https://s22.q4cdn.com/731363943/files/doc_downloads/2021/Form-10K.pdf (emphasis added).

23. To that end, since April 2021, Avalara has been on what the trade press has dubbed an "acquisition spree," acquiring the business and/or the operational assets of at least five companies during that time.[3] These companies include:

- 3CE Technologies, which provides Harmonized System commodity classification codes and verification solutions to businesses;[4]

- CrowdReason, a technology company that helps businesses manage property tax compliance through tax software and data services;[5]

- Track1099, a company that assists businesses in filing employee and contractor income tax information through online software and services;[6]

- DAVO Technologies, a company that assists small businesses automate sales tax filings;[7] and

- INPOSIA Solutions GmbH, a German company that provides e-involving, digital tax report, and system and data integration to assist businesses in meeting compliance requirements.[8]

24. To accomplish its planned transition to the enterprise tax space, and to try to compete directly with Vertex's market-leading tax products, Avalara also needs a specialized

---

[3] *See* https://www.geekwire.com/2021/avalara-continues-acquisition-spree-purchase-property-tax-compliance-company-crowdreason/.

[4] *See id.*

[5] *See* Oct. 18, 2021 Press Release "Avalara Acquires CrowdReason to Help Businesses Manage Property Tax Compliance," available at https://www.avalara.com/us/en/about/press/category/2021/10/avalara-acquires-crowdreason-to-help-businesses-manage-property-tax-compliance.html.

[6] *See* Oct. 1, 2021 Press Release, "Avalara Acquires Track1099 to Help Businesses Manage IRS Form Filing Requirements," available at https://www.avalara.com/us/en/about/press/category/2021/10/avalara-acquires-track1099-to-help-businesses-manage-irs-form-filing-requirements.html.

[7] *See* April 20, 2021 Press Release, "Avalara Acquires Assets from DAVO Technologies to Automate Everyday Sales Tax Compliance for Small Businesses," available at https://www.avalara.com/us/en/about/press/category/2021/04/avalara-acquires-assets-from-davo-technologies.html.

[8] *See* April 5, 2021 Press Release, "Avalara Closes Acquisition of INPOSIA," available at https://www.avalara.com/us/en/about/press/category/2021/04/avalara-closes-acquisition-of-inposia.html.

SAP tax solution provider—like LCR-Dixon—to provide the crucial gap-fillers to make its enterprise product successful.

25. ████████████████████████████████████████████

████████████████████████  ████████████████████████  LCR-Dixon decided to proceed with an acquisition by Vertex.  Vertex sent to LCR-Dixon a Letter of Intent to purchase the company on July 11, 2021, which LCR-Dixon accepted on July 15, 2021. ████████████████████

26.     As soon as Avalara ██████████████████████████████████ ████████, it started working behind the scenes to gut LCR-Dixon of its employees.  In that way, Vertex would come out of the acquisition with a new company but no employees, and Avalara could still build the same products courtesy of the poached employees' knowledge of LCR-Dixon's trade secrets.  Less than two weeks later, and through the efforts of a persistent recruiter and Avalara's Executive Vice President of Corporate Development, Jayme Fishman, Avalara undertook a calculated, concerted effort to try to poach from LCR-Dixon 13 of its 18 employees—*more than 70%* of LCR-Dixon's workforce.  The only employees who were spared from Avalara's outreach were the two co-founders, the office manager, an individual who was about to retire, and an individual who had previously worked with Fishman and had blocked him from contact on LinkedIn.

27.     Avalara's contact was aggressive, anticompetitive, and unlawful.  Avalara began with a series of messages sent to each of the targeted LCR-Dixon employees on July 27, 2021, followed by identical messages to each employee on July 30, August 3, August 8, and September 24, 2021—the day after Vertex announced that it had acquired LCR-Dixon.  This recruitment effort quickly progressed to evening and weekend phone calls, texts from both

Fishman and Avalara's CEO Scott McFarlane, and even gifts like flowers, balloons, and socks.  In Fishman's calls to certain of LCR-Dixon's then-employees to convince them to leave, he conveyed that Avalara intended to "destroy" Vertex.

28.     Each message was sent to the LCR-Dixon employees on the same day and contained the same content.  The first such message, sent on July 27, 2021—after Avalara knew LCR-Dixon had agreed to sell its business to Vertex—promised a "High-Impact and Lucrative Opportunity with Avalara," but offered no specific positions or job duties.  Avalara followed-up with LinkedIn messages to each employee on July 30, 2021 and August 8, 2021.

29.     By September 24, there is no question that Avalara knew that Vertex had acquired LCR-Dixon given the public announcement on September 23, 2021, yet it continued its raid on the LCR-Dixon workforce.  Avalara's September 24 message to each employee promised a "life changing opportunity" because Avalara was "building new capabilities and ha[s] identified you as one of the select few that could help [it] write [its] next chapter and have an even brighter future."  It went on to state that "[t]heir compensation package (base, stock, bonus) could truly change your life."

30.     Contrary to Avalara's message to each employee that "you" are "one of the select few" to help Avalara, Avalara did not simply seek out one or two particularly talented LCR-Dixon employees to come over to its ranks.  Rather, it recruited nearly everyone from LCR-Dixon in an attempt to gut LCR-Dixon of a valuable asset—its people, many of whom had been at the tight-knit company for several years—and cripple Vertex's SAP tax business, leaving only a shell of LCR-Dixon behind for Vertex.

31.     Each LCR-Dixon employee who responded to Avalara's recruiter was almost immediately contacted by phone by Avalara's Executive Vice President of Corporate

Development, Jayme Fishman.  In each instance, Fishman was vague about what that employee's role would entail.  He instead told them to "come over" and Avalara "would figure it out once [they] arrived."  These calls were not interviews; they were purely to recruit without discussion of any given employee's skill set, experience, or whether they were in fact a good fit for Avalara.

33. Within minutes of any phone conversations with Fishman, the LCR-Dixon employee in question received a generic offer letter offering the exact same compensation package as every other LCR-Dixon employee, regardless of experience, specialization, or seniority.  This included a six-figure base salary, annual bonuses, a signing bonus, and a significant value in restricted stock units.  The offer letters did not detail job duties and were provided without any interviews and within an hour, and sometimes less, of an employee speaking with Fishman. Software developers who had worked to build LCR-Dixon's programs from the ground up received the exact same offer as implementation specialists—even those working part-time—who were responsible for installing the software on customer systems.

33. Avalara's offer letters went the extra step to promise to pay each employee all such compensation even if a court were to find that their employment with Avalara violated a non-compete provision of their LCR-Dixon employment agreements.  Specifically, Avalara's letters stated that "[i]n the event a court of law with jurisdiction over you (Employee) or Avalara enjoins you from taking or continuing in the position with Avalara as described in this offer letter, on the grounds that such employment is in violation of a non-competition provision, ***Avalara shall nevertheless pay you all compensation set forth in this Agreement during the pendency of said injunction*** with the expectation that you will continue to work for Avalara after the non-competition provision no longer applies or reimburse Avalara for the amounts paid should you not continue to work for Avalara for a minimum of one month for each month you received

compensation while enjoined from providing services for the Company." In short, Avalara strove to remove every possible barrier that would cause LCR-Dixon's workforce to question its offer.

34. Employees who chose to speak with Fishman soon received a text from Avalara's CEO, which confirmed Avalara's plans to compete with Vertex's enterprise-based tax products, stating he was impressed by what the LCR-Dixon team had accomplished and wanted LCR-Dixon's employees to "help us be part of every transaction globally as we continue to advance in enterprise." The text was identical and read as follows:

> Hey        this is Scott McFarlane, CEO of Avalara. I apologize for the text - would much prefer to call you directly, but I am out this week in the middle of the woods and my connection isn't that great. I just wanted to reach out and let you know we are thrilled at the prospect of having you join us at Avalara. I know you are skeptical, but we've been very impressed by what you and your team have been able to accomplish and are excited for you to help us be part of every transaction globally as we continue to advance in enterprise. I know it's a crazy time for you, but we are excited to have you join our family and will do our best very best to make things as seamless as possible. You are in great hands with Jayme and the HR team…I am sure they are taking great care of you. Please don't hesitate to contact me should you need anything...seriously, if you have any questions do not hesitate to call.
> Thanks for considering Avalara...I'll bet we can do something special together!!!!
> Scott

35. Avalara even attempted to poach an LCR-Dixon contractor who did not list his affiliation with LCR-Dixon on his LinkedIn page. This contractor was not familiar with LCR-Dixon's software, and simply helped LCR-Dixon with Vertex software installations a few hours a

week.  Yet this did not deter Avalara who, upon information and belief, relied on inside information to determine the contractor's identity and affiliation with LCR-Dixon.

36.     Ultimately, Avalara has succeeded in luring away six of LCR-Dixon's employees, and continues to attempt to poach others who initially declined.  The first five left LCR-Dixon for Avalara shortly after the public announcement and closing of Vertex's acquisition. This includes one of LCR-Dixon's primary software developers, who had worked for LCR-Dixon for eight years developing the proprietary tools and products that Vertex acquired.  It also includes individuals with intimate knowledge of LCR-Dixon's business and each of its customers, including LCR-Dixon's relationship with Vertex and its tax products.  The sixth employee just recently left Vertex for Avalara, after originally turning down Avalara's advances and choosing to join Vertex instead.

37.     LCR-Dixon's employees have largely been with the company since it began.  In fact, five of the six LCR-Dixon employees that Avalara has to date succeeded in poaching joined the company in or before 2013, with the sixth joining four years ago in 2017:

- Amy Eller, an implementation specialist with key knowledge of LCR-Dixon's products and customers, joined LCR-Dixon in 2008 and left on September 30, 2021 to become a Senior Director at Avalara;

- Michelle O'Grady and Gregory Polek, implementation specialists with key knowledge of LCR-Dixon's products and customers, including Vertex, joined LCR-Dixon in 2012 and left on September 30, 2021 to become Senior Directors of Enterprise Solutions at Avalara;

- Frank Souik, lead developer of SPOT Reports among other core LCR-Dixon programs, joined LCR-Dixon in 2013 and left on September 30, 2021 to become a Senior Director of Enterprise Solutions at Avalara;

- Jamie Kimball (formerly Jimenez), an implementation specialist with key knowledge of LCR-Dixon's products and customers, joined LCR-Dixon in 2017 and left on September 30, 2021 to become a Senior Director of Enterprise Solutions at Avalara; and

- Melissa Metcalf, an implementation specialist with key knowledge of LCR-Dixon's products and customers, joined LCR-Dixon in October 2013, then

joined Vertex in October 2021, and left Vertex on December 17, 2021 to become a Senior Director of Enterprise Solutions at Avalara.

38.     Avalara is conducting this raid in an attempt to cripple the business of the leading company in the enterprise SAP tax space that Avalara was seeking to enter—Vertex—and also to ensure that it secured access to LCR-Dixon's proprietary, trade secret information ████

████████████████████████████████

### Avalara And The Employees It Poached From LCR-Dixon
### Misappropriated LCR-Dixon's Trade Secrets

39.     Avalara has misappropriated Vertex's trade secrets, in the first instance, by poaching the employees of LCR-Dixon to build a similar product or products for Avalara.  These employees have knowledge of LCR-Dixon's (now Vertex's) core technology, which was learned on the job at LCR-Dixon, is unique to LCR-Dixon, and cannot be unlearned.  There is no way for Avalara's employees to build products like those of LCR-Dixon's without misappropriating this proprietary, trade secret information, which Vertex legally acquired from LCR-Dixon.  Disclosure of those trade secrets to Avalara by virtue of its corporate raid of LCR-Dixon is inevitable.

40.     At least two LCR-Dixon employees that Avalara contacted—including one of the employees who is now employed by Avalara—informed Avalara during its recruitment efforts that they would not be able to work for Avalara without using what they knew from working at LCR-Dixon.  These employees told Fishman during phone calls that they would not be able to unlearn confidential information they had learned at LCR-Dixon about its tools, and then work on building the same or similar tools at Avalara without using that information.  But Avalara continued unabated, telling the employees to come over to Avalara regardless.

41.     Even more, Vertex has uncovered evidence through an ongoing forensic investigation of company laptops and systems that at least two former LCR-Dixon employees, Amy Eller and Frank Souik, misappropriated LCR-Dixon's proprietary, confidential, and trade

secret information prior to leaving LCR-Dixon.  These two employees (and perhaps others) transferred documents and information from LCR-Dixon's servers and password-protected cloud-storage platforms to their own personal accounts or devices in their final days working for LCR-Dixon—even after committing to work for Avalara to develop the same type of products and business they had spent years learning about through working at LCR-Dixon.

42.     In the three days before Amy Eller left her employment at LCR-Dixon for Avalara, she downloaded from LCR-Dixon's corporate Google Drive thousands of proprietary LCR-Dixon files and, on information and belief, uploaded them to her personal Google Drive. These files included large swaths of LCR-Dixon's confidential and trade secret information, such as customer lists; user guides; technical and functional specifications; design and configuration documents; implementation templates for core LCR-Dixon software, including VENDORecon, TUESday, SPOT Reports, and Diagnostax; passwords and login information; and documents from various LCR-Dixon customer projects, including design and testing documents, client deliverables, software specifications, and project management documents.  It also included more than 150 documents specific to Vertex, including user, installation, configuration, and key interface guides for Vertex software, including O-Series and Accelerator.

43.     But Eller didn't stop there: in addition to uploading thousands of documents to her personal Google Drive, Eller emailed to her personal Gmail address confidential, proprietary, and/or trade secret LCR-Dixon (now Vertex) documents.  These included numerous memoranda and templates that were researched and drafted by LCR-Dixon employees, which compiled and distilled LCR-Dixon's experience with enterprise SAP systems, complete with workarounds developed by LCR-Dixon over the course of 15 years in the industry.  Referring to these documents would permit a company like Avalara looking to enter the enterprise SAP tax

space to shortcut years of hard work and jump straight to LCR-Dixon's conclusions about how to best create programs that integrate with SAP and tax systems like Vertex's or Avalara's.

44.     Prior to returning her LCR-Dixon laptop to Vertex, and in an apparent attempt to cover her tracks, Eller conducted a push-button reset of the device.  The push-button reset returned the device to its factory settings, effectively wiping from it the vast majority of data that could otherwise show possible additional misappropriation of Vertex's proprietary, confidential, and trade secret information.  No LCR-Dixon or Vertex policy or directive required employees to conduct a push-button reset of their company laptops.  Indeed, certain of LCR-Dixon's policies concerning its intellectual property required that LCR-Dixon employees maintain—and expressly not destroy—records related to the conception, creation, discovery, and other development of LCR-Dixon's intellectual property.

45.     The information that Eller downloaded from LCR-Dixon's Google Drive account was password protected and not available to anybody outside of LCR-Dixon.  Similarly, the memoranda she forwarded to her Gmail account were shared exclusively with LCR-Dixon employees by their corporate, password-protected email accounts.  All networks hosting LCR-Dixon's confidential and proprietary information are encrypted and secure, and require passwords for access.  Computers provided to LCR-Dixon employees are encrypted and password protected.

46.     LCR-Dixon also had policies in place applicable to all of its employees prohibiting the use or dissemination of its proprietary, confidential, and trade secret information for non-LCR-Dixon work purposes, or beyond LCR-Dixon.  Per those policies, employees committed "not to disclose to any person or entity outside Employer or use for any purpose other than in the performance of Employee's work for Employer [sic] any confidential or proprietary technical, financial, marketing, manufacturing, distribution or other technical or business

information or trade secrets of Employer, including without limitation, Employer's concepts, techniques, processes, methods, systems, designs, cost data, computer programs, formulas, development or experimental work, work in progress, customers and suppliers . . ." or "any confidential or proprietary information which is circulated within Employer."

47.     Frank Souik worked as a software developer for LCR-Dixon for eight years, and was the lead developer of SPOT Reports, in addition to assisting to develop core LCR-Dixon programs such as Diagnostax and even the Accelerator developed specifically for Vertex.  These LCR-Dixon programs are proprietary, and Souik acknowledges on his LinkedIn page that his work at LCR-Dixon required him to "[d]esign, develop, and support industry leading, proprietary SAP sales and use tax solutions" as well as "[i]mplement and support external tax engines with SAP."

48.     Based on the data available from forensic analysis, Souik uploaded over a thousand documents from his LCR-Dixon laptop to his personal Microsoft OneDrive account—many of which contained LCR-Dixon's confidential, proprietary, and/or trade secret information. Similarly, on September 27, 2021—three days prior to leaving LCR-Dixon for Avalara—Souik saved thousands of documents from his LCR-Dixon laptops to an external hard drive.  Crucially, the data Souik saved to his personal accounts included more than 70 of what are known as "transports," which contain the proprietary software code for LCR-Dixon's products.  Souik also took more than 250 files reflecting LCR-Dixon program or custom code developed for and sent to specific clients, or sent as part of software code enhancements.  This code that Souik took is foundational to LCR-Dixon's products and would be one of the first things Avalara would need to build competitive products from the ground up.

49.     Transport files, including the ones that Souik took, are delivered directly to clients for installation.  LCR-Dixon's proprietary program code is visible in the transports that

Souik took.  Transport files were stored on LCR-Dixon's password-protected Citrix ShareFile account and were accessible *only* to LCR-Dixon software developers—just six of the company's 18 employees.  Furthermore, LCR-Dixon's licensing agreements with their customers contained strict confidentiality provisions, and LCR-Dixon required its customers to execute these agreements before they could receive the LCR-Dixon code transports.  But Souik circumvented each of these protections when he saved the code to his personal accounts.

50.     In addition to the code that Souik took, he also took more than 200 LCR-Dixon user guides, technical and functional specifications, software design and configuration documents, and implementation templates, including for LCR-Dixon products SPOT Reports, TUESdsay, Diagnostax, and flexRFC AR.  These documents are marked confidential and were only sent to customers who licensed the LCR-Dixon software and otherwise signed the licensing agreements, which included a strict confidentiality provision, or to implementation partners who were also subject to non-disclosure agreements.

51.     Presumably to cover his tracks, and like Eller, Souik conducted a push-button reset of his two LCR-Dixon issued laptops to restore both to their factory settings before returning them to Vertex.  He reset the first on the same date that he departed LCR-Dixon—September 30, 2021—but waited to conduct the second until two weeks later, on October 14, 2021, *while he was employed by Avalara*.  As a result of these push-button resets, the vast majority of data has been wiped from the laptops.

52.     Souik and Eller were not alone in their decision to conduct a push-button reset of their LCR-Dixon-issued laptops prior to returning them to Vertex.  Other of the employees that Avalara poached also conducted a push-button reset of their laptops between September 30, 2021 and October 11, 2021 without any request to do so by Vertex or LCR-Dixon.  Vertex had

contacted each of the employees after their departures seeking the return of their company devices, and that communication made no mention of a push-button reset.  To the contrary, it asked that the employees "place the laptops in laptop boxes (with the padding), [and] *keep them password protected*."  (Emphasis added).  There would be no need to keep a laptop password protected if Vertex intended them to be wiped via a push-button reset.  These push-button resets restored the machines to their factory settings and has made it nearly impossible for Vertex to access them and determine whether any additional misappropriation or otherwise unlawful conduct occurred.

53.     Avalara's actions have resulted and will continue to result in significant damages to Vertex by virtue of Avalara's unfairly competitive actions, including its raid of LCR-Dixon/Vertex's workforce, its intentional interference with Vertex's contractual relations, and its misappropriation of Vertex's confidential, proprietary and/or trade secret information by inevitable disclosure or otherwise.

## COUNT I
### Unfair Competition / Corporate Raiding

54.     Vertex realleges and incorporates by reference the allegations in paragraphs 1 through 53 as set forth herein.

55.     Avalara and Vertex both operate in the tax solutions space, and Avalara has publicly acknowledged that it is looking to expand its business into enterprise SAP tax solutions.  Upon information and belief, Avalara is building an enterprise SAP tax solution business to compete directly with Vertex.

56.     Vertex's enterprise SAP tax solutions are dependent upon programs like those made by LCR-Dixon, which enable the tax tools to "speak" to a client's SAP business management software.  To expand into Vertex's business, Avalara needs proprietary programs

such as SPOT Reports and Diagnostax, both of which were exclusively developed by LCR-Dixon (and are now owned by Vertex).

57.   ███████████████████████████████████—including after Avalara knew that Vertex was acquiring LCR-Dixon—Avalara engaged in a systematic campaign to induce LCR-Dixon's workforce to leave their employment and instead work for Avalara. Avalara's raid targeted more than 70% of LCR-Dixon's employees and to date has taken a third of the workforce of the company that Vertex had just purchased for nearly $100 million.  Avalara's workforce raid of LCR-Dixon employees who joined Vertex is ongoing, as it continues to try to persuade them to join Avalara.

58.   Avalara's raid of LCR-Dixon's employees has not been done for a legitimate business purpose or to obtain the services of a handful of particularly skilled employees. Rather, Avalara has the improper intent to cripple Vertex's competitive business and obtain access to its trade secrets and other proprietary and confidential information (either by inevitable disclosure or otherwise), in violation of the employees' employment agreements and applicable law.

59.   Avalara's acts of unfair competition have and will directly and proximately cause substantial damage to Vertex and its business, including the loss of a significant portion of the company that it recently acquired; the loss of exclusive access to and ownership of LCR-Dixon's proprietary technology, which Vertex acquired; damage to its reputation; and potential loss of market share and profits with existing and prospective customers.  If left to continue unabated, Avalara will upon information and belief use the information that each of the poached LCR-Dixon employees learned exclusively as a result of their experience at LCR-Dixon to rebuild

the same or similar products and tools as LCR-Dixon for Avalara's benefit, and in direct competition with Vertex.

60.     Avalara's actual and/or threatened actions will continue to cause Vertex irreparable harm if not enjoined.

## COUNT II
### Intentional Interference With Contractual Relations

61.     Vertex realleges and incorporates by reference the allegations in paragraphs 1 through 60 as set forth herein.

62.     Avalara's raid has intentionally interfered with the prospective contractual relationship between Vertex and its employees.   Avalara unfairly induced five LCR-Dixon employees to leave their at-will employment at LCR-Dixon, and another to leave her employment from Vertex after initially declining Avalara's offer.   These employees were induced to leave through an independent wrongful act:   Avalara seeks to build a competitive product using the confidential, proprietary, and trade secret information that the LCR-Dixon employees have learned over the course of their experience working for LCR-Dixon and building its specialized SAP tax tools.   It is inevitable that this confidential, proprietary, and trade secret information, which now belongs to Vertex, has been or will be disclosed to Avalara.   LCR-Dixon's former employees are highly familiar with LCR-Dixon's (now Vertex's) trade secrets, and the skills these employees developed was acquired exclusively by virtue of their employment at LCR-Dixon and their reliance on its trade secret information.   It is not possible for the LCR-Dixon employees that Avalara poached to build a product for Avalara like they built for or worked on LCR-Dixon (now Vertex) without necessarily disclosing proprietary, confidential, and trade secret information.

63.     Avalara's actions were willful and intentional.

64.     Avalara's actions were calculated to cause damage to Vertex and its business, and for the unlawful purpose of causing damage and loss to Vertex without justifiable cause.

65.     As a direct and proximate result of Avalara's conduct, Vertex has suffered and, if Avalara's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vertex's remedy at law is inadequate, Vertex seeks, in addition to damages, injunctive relief to recover and protect its legitimate business interests.  Vertex's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## COUNT III

### Violation of Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.)

66.     Vertex incorporates by reference paragraphs 1 through 65 above as though set forth herein.

67.     Vertex, by virtue of its acquisition of LCR-Dixon, owns and possesses certain confidential, proprietary, and trade secret information, including for example, comprehensive source code files, portions of custom source code developed for specific clients, technical and functional specs, design and configuration documents, and implementation templates for LCR-Dixon's software; documents detailing the specifics of Vertex's software, including user guides, installation and configuration guides, and interface guides; confidential LCR-Dixon client lists; and memoranda prepared by LCR-Dixon compiling 15 years'-worth of insider SAP knowledge learned on the job while employed by LCR-Dixon, and created exclusively to aid the company in its future development of SAP technology and in SAP implementations—both of which were core parts of LCR-Dixon's business.

68.     Prior to its acquisition by Vertex, and continuing since, LCR-Dixon and Vertex have taken reasonable measures to keep such information secret and confidential.

69.     Vertex and, before it, LCR-Dixon, has at all times taken stringent security measures to preserve the secrecy of its trade secrets.  LCR-Dixon was a small company consisting of 18 employees, the vast majority of whom had worked for it for a decade or more.  Access to the documents and memoranda detailed above was limited to LCR-Dixon's password-protected corporate email accounts and cloud-storage accounts, which was also password protected and limited exclusively to LCR-Dixon's employees.  Even contractors working for LCR-Dixon did not have access to these documents or memoranda.  Access to LCR-Dixon's code was furthermore limited to LCR-Dixon's six software developers; it was not available to all LCR-Dixon employees.

70.     LCR-Dixon furthermore had in place policies pursuant to which its employees were required to maintain the confidentiality of its proprietary, confidential, and trade secret information.  Per those policies, employees committed "not to disclose to any person or entity outside Employer or use for any purpose other than in the performance of Employee's work for Employer [sic] any confidential or proprietary technical, financial, marketing, manufacturing, distribution or other technical or business information or trade secrets of Employer, including without limitation, Employer's concepts, techniques, processes, methods, systems, designs, cost data, computer programs, formulas, development or experimental work, work in progress, customers and suppliers . . ." or "any confidential or proprietary information which is circulated within Employer."

71.     Due to these security measures, LCR-Dixon's (now Vertex's) confidential, proprietary, and trade secret information is not available for others to use.

72.     LCR-Dixon's (now Vertex's) proprietary, trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

73.     As multiple of LCR-Dixon's employees have told Avalara, there is no way for the employees that Avalara has hired away from LCR-Dixon to build and implement products they have been hired to work on at Avalara without invoking LCR-Dixon's—now Vertex's—proprietary, trade secret information.  Disclosure of those trade secrets to Avalara by virtue of its poaching these employees is inevitable.  If Avalara is not enjoined, it will continue to misappropriate and use Vertex's trade secret information for its own benefit and to Vertex's detriment.

74.     As a direct and proximate result of Avalara's conduct, Vertex has suffered and, if Avalara's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vertex's remedy at law is inadequate, Vertex seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Vertex's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## COUNT IV
### Violation of Pennsylvania Uniform Trade Secrets Act (12 P.S. § 5302 et seq.)

75.     Vertex incorporates by reference paragraphs 1 through 74 above as though set forth herein.

76.     Vertex, by virtue of its acquisition of LCR-Dixon, owns and possesses certain confidential, proprietary, and trade secret information, including for example,

comprehensive source code files, portions of custom source code developed for specific clients, technical and functional specs, design and configuration documents, and implementation templates for LCR-Dixon's software; documents detailing the specifics of Vertex's software, including user guides, installation and configuration guides, and interface guides; confidential LCR-Dixon client lists; plus templates and memoranda prepared by LCR-Dixon compiling 15 years'-worth of insider SAP knowledge learned on the job while employed by LCR-Dixon, and created exclusively to aid the company in its future development of SAP technology and in SAP implementations—both of which were core parts of LCR-Dixon's business.

77.    Prior to its acquisition by Vertex, and continuing since, LCR-Dixon and Vertex have taken reasonable measures to keep such information secret and confidential.

78.    Vertex and, before it, LCR-Dixon, has at all times taken stringent security measures to preserve the secrecy of its trade secrets.  LCR-Dixon was a small company consisting of 18 employees, the vast majority of whom had worked for it for a decade or more.  Access to the documents and memoranda detailed above was limited to LCR-Dixon's password-protected corporate email accounts and cloud-storage accounts, which was also password protected and limited exclusively to LCR-Dixon's employees.  Even contractors working for LCR-Dixon did not have access to these documents or memoranda.  Access to LCR-Dixon's code was furthermore limited to LCR-Dixon's six software developers; it was not available to all LCR-Dixon employees.

79.    LCR-Dixon furthermore had in place policies pursuant to which its employees were required to maintain the confidentiality of its proprietary, confidential, and trade secret information.  Per those policies, employees committed "not to disclose to any person or entity outside Employer or use for any purpose other than in the performance of Employee's work for Employer [sic] any confidential or proprietary technical, financial, marketing, manufacturing,

distribution or other technical or business information or trade secrets of Employer, including

without limitation, Employer's concepts, techniques, processes, methods, systems, designs, cost

data, computer programs, formulas, development or experimental work, work in progress,

customers and suppliers . . ." or "any confidential or proprietary information which is circulated

within Employer."

80.     Due to these security measures, LCR-Dixon's (now Vertex's) confidential,

proprietary, and trade secret information is not available for others outside of the company to use.

81.     Avalara knew, or had reason to know, that the LCR-Dixon employees

whom Avalara hired had a duty to keep this information secret.  In its conversations with LCR-

Dixon employees, Avalara was made aware that LCR-Dixon employees could not disclose LCR-

Dixon's confidential and proprietary information to Avalara.

82.     LCR-Dixon's (now Vertex's) information derives independent economic

value from not being generally known to, and not being readily ascertainable through proper means

by, another person who could obtain economic value from the disclosure or use of the information.

83.     As multiple of LCR-Dixon's employees have told Avalara, there is no way

for the employees that Avalara hired away from LCR-Dixon to build and implement products they

have been hired to work on at Avalara without invoking LCR-Dixon's—now Vertex's—

proprietary, trade secret information.  Disclosure of those trade secrets to Avalara by virtue of its

poaching these employees is inevitable.

84.     If Avalara is not enjoined, it will continue to misappropriate and use

Vertex's trade secret information for their own benefit and to Vertex's detriment.

85.     As a direct and proximate result of Avalara's conduct, Vertex has suffered

and, if Avalara's conduct is not stopped, will continue to suffer, severe competitive harm,

irreparable injury, and significant damages, in an amount to be proven at trial. Because Vertex's remedy at law is inadequate, Vertex seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Vertex's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## **PRAYER**

**WHEREFORE**, Vertex prays for the following relief:

1.      That the Court issue a permanent injunction against Avalara, and all others in active concert or participation with Avalara, enjoining and restraining them from the further solicitation of LCR-Dixon's employees who are now employed by Vertex; enjoining and restraining them from using or disclosing in any way Vertex's confidential, proprietary, and/or trade secret information in their possession, custody, or control, or in the possession, custody, or control of anyone in active concert or participation with Avalara; and ordering that Avalara and anyone in active concert or participation with Avalara return to Vertex its confidential, proprietary, and/or trade secret information in their possession, custody, or control;

2.      That Vertex be awarded general, special, actual and/or statutory damages, according to proof at trial;

3.      That Vertex be awarded the costs of this action and the reasonable attorneys' fees incurred by it in prosecuting this action;

4.      That Vertex be awarded punitive and exemplary damages in a sum to be ascertained at trial;

5.      That Vertex be awarded interest at the legal rate; and

6.      Such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims herein.


Dated: January 25, 2022
Philadelphia, Pennsylvania


By: /s *Leigh Ann Buziak*

**BLANK ROME LLP**

Laurence S. Shtasel
PA I.D. 58528
*laurence.shtasel@blankrome.com*
Leigh Ann Buziak
PA I.D. 93949
*leighann.buziak@blankrome.com*
130 North 18th Street
One Logan Square
Philadelphia, PA 19103
Tel.: (215) 569-5386
Fax: (215) 569-5555


**LATHAM & WATKINS LLP**

Perry Viscounty (*pro hac vice* motion to be filed)
*perry.viscounty@lw.com*
Nicole Valco (*pro hac vice* motion to be filed)
*nicole.valco@lw.com*
Kristine W. Hanson (*pro hac vice* motion to be filed)
*kris.hanson@lw.com*
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Tel:  (415) 391-0600
Fax:  (415) 395-8095